Ronald A. KATZ, Technology Licensing, L.P., and MCI Telecommunications Corporation, Plaintiffs,

v.

AT & T CORPORATION, et al., Defendants.

No. Civ.A. 97–4453.

United States District Court, E.D. Pennsylvania.

Feb. 2, 2000.

---

Perry S. Bechtle, Philadelphia, PA, for plaintiff.

Ronald P. Schiller, Philadelphia, PA, for defendant.

### MEMORANDUM

LOWELL A. REED, Jr., Senior District Judge.

Presently before the Court is an appeal of plaintiffs Ronald A. Katz Technology Licensing, L.P. ("RAKTL") and MCI Telecommunications Corporation ("MCI") from the Report and Order of the Special Master of May 13, 1999 (Document No. 150, "Objections to the Report and Order of the Special Master"), the response of defendants AT & T Corporation, Universal Card Services Corporation and AT & T American Transtech, Inc., and reply of plaintiffs thereto. Specifically, plaintiffs appeal the granting of the defendants' motion to compel documents relating to the negotiations between RAKTL and MCI over the licensing agreement as well as documents relating to a number of subjects or concepts appearing in documents which were disclosed in prior litigation. (Order of Special Master at ¶¶ 2 & 3). Based upon the following analysis and to the extent that the Report and Order of the Special Master as modified by this memorandum, it will be affirmed.

### I. Background

Ronald A. Katz ("Katz") is the inventor in a large body of patents dealing with telephonic interactive voice applications. The plaintiffs filed this patent infringement suit against the defendants alleging that the defendants are infringing on a number of patents in the Katz portfolio.[1] In total, over 400 patent claims are at issue in this lawsuit. As this is an extremely complex case involving a highly technical matter, on December 5, 1997, this Court by Order appointed a Special Master to manage discovery, including the resolution of discovery disputes. (Document No. 23).

In October 1997, AT & T propounded document requests and interrogatories that sought, among other things, the documents and information at issue here. Plaintiffs objected to some of the interrogatories and responded to others beginning in November 1997, and began producing documents to AT & T in the Spring of 1998. On October 23, 1998, defendants moved to compel the production of certain documents that plaintiffs withheld on the grounds of attorney-client privilege and/or work product doctrine.

On May 13, 1999, the Special Master issued a Report and Order compelling plaintiffs to produce in significant part the documents requested by defendants. Plaintiffs only appeal the decision of the Special Mas-

---

1. Ronald A. Katz Technology Licensing, L P. is the licensing entity for the Katz patents and MCI is a non-exclusive licensee of Katz's patent port-folio. In addition to a license to the Katz patent portfolio, MCI also has the exclusive right to license or enforce the portfolio against AT & T.

ter with respect to paragraphs 2 and 3 of the Report and Order of May 13, 1999 In paragraph 2, the Special Master Ordered that plaintiffs produce all communications between "Mr. Katz and his attorney on the one hand [and] MCI representatives on the other during the period of license negotiations until the date of the written agreement between [RAKTL] and MCI, dated May 29, [1996]." [2] (Order at ¶ 2). In paragraph 3, the Special Master ordered that plaintiffs shall produce "those documents related to the subject matters referred to in the Report of the Special Master as they relate to the six patents and one patent application involved in . . . [a prior litigation], but plaintiffs shall not be required to produce documents related to such subject matters with respect to any other patents that were not involved in the [prior] litigation." (*Id.* at ¶ 3).

## II. Standard

■■■ The Special Master is vested with full and complete powers under Federal Rule of Civil Procedure 53(c) and (d). As such, the Special Master's decision is the functional equivalent of a magistrate judge's adjudication of a non-dispositive motion. (Document No. 23 at second ¶ 2). The decision of the Special Master in a discovery dispute, as the decision of a magistrate would be, is entitled to great deference. *See Honeywell v. Minolta Camera Co.,* 1990 WL 66182, at *1 (D.N.J. May 15, 1990). Accordingly, this Court will affirm a decision of the Special Master unless it finds the decision to be clearly erroneous or contrary to the law. *See* 28 U.S.C. § 636(b)(1)(A); Local R. Civ. Pro. 72.1(IV)(a). This Court will determine that a finding is clearly erroneous " 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Honeywell,* 1990 WL 66182, at *1 (quoting *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). Finally, as the issues presented here involve questions of privilege, the Court of Appeals for the Third Circuit has held that "the applicability of a privilege

is a factual question" and the determination of "the scope of the privilege is a question of law." *In re Bevill, Bresler & Schulman Asset Management Corp.,* 805 F.2d 120, 124 (3d Cir.1986).

## III. Discussion

Plaintiffs first object to the decision of the Special Master ordering them to produce documents which relate to the negotiations between RAKTL and MCI which culminated in the licensing agreement which gave MCI a non-exclusive license to the patent portfolio and an exclusive right to license or enforce the patent portfolio against AT & T. Specifically, plaintiffs object to the production of documents exchanged between RAKTL and MCI after December 19, 1995, (and through May 29, 1996, the date the licensing agreement was signed). Plaintiffs maintain that in December 1995, they reached an agreement in principal to enforce the Katz patent portfolio against AT & T and, therefore, they had a common legal interest in enforcing the Katz patents. The existence of a community of interest, plaintiffs argue, protects the exchange of privileged and work-product materials among those sharing that interest.

As an initial matter, the parties dispute whether the proper standard review on this issue is "clearly erroneous" or "contrary to law". As previously noted the applicability of the attorney-client privilege is a factual question and the scope of a privilege is a question of law. *In re Bevill,* 805 F.2d at 124. Thus, the findings of the Special Master with respect to the applicability of the common interest doctrine are reviewed under a clearly erroneous standard. *See Chicago Tribune Co. v. U.S. Department of Health & Human Servs.,* 1997 WL 1137641, at *3 (N.D.Ill. Mar. 28, 1997) (magistrate judge did not commit clear error by finding that parties shared a common legal interest).

■■■ The common interest doctrine is an exception to the general rule that the attorney-client privilege is waived upon disclosure of privileged information with a third party.

---

**2.** The Report and Order of the Special Master references an agreement of May 29, 1989. It is undisputed that the agreement referred to by the

Special Master was actually signed on May 29, 1996.

*See, e.g., In re Regents of the Univ. of Cal.,* 101 F.3d 1386, 1389 (Fed.Cir.1996); *Giovan v. St. Thomas Diving Club Inc.,* 1997 WL 360867, at *4 (Terr. V.I. June 16, 1997); *Thompson v. Glenmede Trust Co.,* 1995 WL 752443, at *4 (E.D.Pa. Dec. 19, 1995); *Hewlett–Packard Co. v. Bausch & Lomb, Inc.,* 115 F.R.D. 308, 309–10 (N.D.Cal.1987). The common interest doctrine does not create an independent privilege, but depends upon a proper showing of the other elements of the attorney-client privilege.[3] *See Allendale Mut. Ins. v. Bull Data Sys.,* 152 F.R.D. 132, 140 (N.D.Ill.1993). Pursuant to the common interest doctrine (or community of interest doctrine), "parties with shared interest in actual or potential litigation against a common adversary may share privileged information without waiving their right to assert the privilege." *Thompson,* 1995 WL 752443, at *4. The nature of the interest, however, must be "identical, not similar, and be legal, not solely commercial." *In re Regents,* 101 F.3d at 1390; *see also Hewlett–Packard,* 115 F.R.D. at 309 (citing *Union Carbide v. Dow Chemical,* 619 F.Supp. 1036, 1047 (D.Del. 1985)).

The Special Master framed the dispute between the parties as follows: "[t]here is an issue as to whether MCI and [RAKTL] reached an oral agreement in principle prior to May 29, [1996,] which plaintiffs contend bars the production of the documents sought, after the oral agreement in principle was reached." (Report of Special Master at ¶ 2). The Special Master found as a fact that "hav[ing] reviewed the documents *in camera* between [RAKTL] and [MCI], ... I am satisfied that there was no final agreement until it was actually signed on May 29, [1996]. In the circumstances, I fail to see either a protected attorney-client or work product-privilege regarding communications between [MCI] and [RAKLT] during the period in question." *(Id.).*

█ Plaintiffs argue that the existence of a final agreement is not a required prerequisite under the common interest doctrine and, because the Special Master rested his decision on whether the parties had reached a final agreement, his decision is contrary to the law. Plaintiffs are correct in their assertion that the common interest doctrine protects privileged and work-product materials even if there is no "final" agreement or if the parties do not ultimately unite in a common enterprise. *See Hewlett–Packard,* 115 F.R.D. at 310; *see also Rayman v. American Charter Fed. Sav. & Loan Ass'n,* 148 F.R.D. 647, 654 n. 9 (D.Neb.1993). The fact that a final or formal agreement is not required, however, does not establish that the requisite identity of interest exists. To take advantage of the common interest doctrine the plaintiffs must still satisfy their burden of proving first that the material is privileged and second that the parties had an identical legal, and not solely commercial, interest.[4]

3. In order to establish that communications are protected by the attorney-client privilege, the following elements must be present: (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his or her subordinate, and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion of law or (ii) legal services or (iii) assistance in some legal proceeding, and (d) not for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client. *Rhone–Poulenc Rorer v. Home Indem. Co.,* 32 F.3d 851, 862 (3d Cir. 1994).

4. Plaintiffs rely heavily on the decision of the Federal Circuit in *In re Regents of Univ. of Cal.,* 101 F.3d at 1389–91. In that case, the Federal Circuit issued an extraordinary writ reversing the district court's determination that a patentee and a nonexclusive licensee did not share the requisite community of interests to allow the patentee to invoke the attorney-client privilege with respect to communications with the licensee. *Id.* at 1387–88. The Federal Circuit determined that the third party was "more than a non-exclusive licensee, and shared the interest that [the patentee] would obtain valid and enforceable patents." *Id.* at 1390. Be that as it may, here MCI was not a licensee until after May 29, 1996. Although a licensee and a patentee may have the requisite identity of interests, it does not follow *a fortiori* that patentee has the requisite identity of interests with a potential licensee or a party with which the patentee is negotiating a licensing agreement. Thus, to the extent that *In re Regents* establishes that a party that is something "more than a non-exclusive licensee" and a patentee can have the requisite identity of interest to invoke the common interest doctrine, it is inapposite to the factual situation

*In re Regents,* 101 F.3d at 1390; *Allendale,* 152 F.R.D. at 140.

■ Although the factual findings and analysis of the Special Master are rather cursory, I disagree with the plaintiffs' interpretation of the Report and Order. Having framed the issue as whether there was an agreement in principle prior to the signing of the May 29, 1996, licensing agreement, I understand the Special Master to have found that there was none. Thus, I am not persuaded that the Special Master misapplied or ignored the law of the common interest doctrine by stating that there was no "final" agreement until the actual signing of the licensing agreement Rather, I conclude that the Report reflects the determination by the Special Master that the plaintiffs failed to meet their burden of showing the requisite identity of interests required under the doctrine because the parties had not reached an agreement, final or otherwise, as to the licensing issues prior to the signing of the agreement on May 29, 1996. *See In re Bevill,* 805 F.2d at 122 (defendant did not produce evidence that parties agreed to pursue joint defense strategy). Although he did not explicitly address the common interest doctrine, the issue was identified and argued to the Special Master. It is apparent that the Special Master found as a factual matter that "in the circumstances" the plaintiffs failed to prove that the parties to the negotiations shared an identity of interests such to invoke the common interest doctrine. Having failed to prove the factual entitlement to the common interest exception, the communications sought by defendants here are not protected from disclosure.

Plaintiffs outline a version of the facts in their argument which may support a factual finding different than that made by the Special Master Plaintiffs cannot, however, prevail on a weight of the evidence argument here when the finding of the Special Master is entitled to factual deference if not clearly erroneous.[5] From my independent review of the evidence brought to my attention by the parties on appeal, the record evidence is sufficiently ambiguous as to the existence of an identity of interest to preclude overturning the decision of the Special Master as clearly erroneous.[6] Accordingly, the decision of the Special Master in paragraph 2 of his Report and Order will be affirmed.

here. Whether such an alignment of interest exists is a case specific determination to be made under the facts of the case.

5. To the extent that the decision included an determination of the scope of the privilege or waiver of the privilege, the legal conclusions of the Special Master on this issue are not contrary to law.

6. I am satisfied that the parties have produced to the Court all of the materials they provided to the Special Master both openly and *in camera.* A careful review of the record reveals that the evidence does not contradict the conclusion of the Special Master that the parties to the negotiations did not prove that they shared an identity of interests so as to invoke the common interest doctrine. At the outset of the negotiations in 1995, the interests of the parties were clearly adversarial and the negotiations over the terms of the licensing agreement were conducted at arms length Other examples in the record before the Special Master include the confidentiality agreement between the parties which was entered into, according to the terms of the correspondence, so that the content of their discussions could not be used by either participant for any other purpose, including a future lawsuit between them. Similarly, the "deal points" exchanged in January 1996, included a written disclaimer that nothing in the document was binding and that it was just an outline of a potential deal. Although at his deposition Mr. Casey described the relationship between the parties a joint activity or joint venture, the final agreement between the parties specifically states that the parties shall be independent contractors and that "in no way is this Agreement to be construed as creating a joint venture, partnership or agent relationship between the Parties." (Licensing Agreement, at ¶ 12.5). In addition, such core terms as compensation were not solidified until late in the negotiations. Consequently, a reasonable person in the position of the Special Master could infer from the record that there was no clear expression of the content or terms of the "agreement in principal" upon which plaintiffs rely. Indeed, there is no objective evidence from which a fact finder could conclusively determine that the parties had an agreement prior to the signing of the licensing agreement. Thus, although a final and formal agreement is not required to establish the existence of a community of interests such to invoke the common interest doctrine, there is evidence in the record of this case from which Special Master could infer that the parties to the negotiations did not have an identity of interests such to invoke the common interest doctrine before they entered into the licensing agreement.

The second issue on appeal before this Court involves the scope of a waiver of the attorney-client privilege in connection with the disclosure of privileged documents in a prior litigation. As background,[7] the prior litigation was initiated in 1990 wherein the plaintiff, who had been assigned a license to Katz's then existing patents and applications, sued a competitor.[8] The lawsuit was settled in 1993. Plaintiffs here contend that during the prior litigation, First Data, the party aligned with the plaintiffs here, produced a discrete set of otherwise privileged documents for the purpose of corroborating the dates of conception for certain inventions in furtherance of their case. Accordingly, plaintiffs here assert that the "subject matter" of the waiver of the attorney-client privilege is the date of conception of the inventions claimed in three of the six patents and one patent application at issue in the prior litigation. Plaintiffs thus argue that the only documents for which the privilege has been waived are documents establishing dates of conception.

Defendants argue that the documents discuss basic concepts and features that underlie most or all of the asserted patents, and that the "subject matter" of the documents are these concepts and features, resulting in a waiver as to all privileged documents dealing with these concepts and features. Defendants thus argue that the documents disclosed by First Data served to waive the protection of privilege with respect to the following concepts: (1) connection to a facility; (2) a designation number; (3) having the caller enter personal identification information; (4) automatic number identification ("ANI"); (5) dialed number identification service ("DNIS"); (6) processing of statistical data to isolate a subset, (7) computation of a caller's score in a game system, (8) the capability of interfacing multiple formats, (9) combining digital and voice inputs; and (10) transfer to live operator.

The Special Master held that the waiver was not limited solely to matters relating to the dates of conception but rather that it encompassed the ten topics as argued by the defendants In so doing, the Special Master reasoned that when a party voluntarily discloses otherwise privileged information, the waiver of a privilege extends to the entire subject matter of the disclosure. The Special Master recognized as well that privileges are subject to the overriding concept of fairness, implicitly finding that it would be unfair to allow the party seeking the protection of the privilege to subjectively determine the limits of the waiver where that party had disclosed information for tactical advantage. The Special Master also implicitly reasoned that limiting the waiver to the subject of conception dates would allow plaintiffs to unilaterally define the limits of the disclosure. The Special Master, however, held in accordance with the law that the waiver was limited to subject matters disclosed in the prior litigation as related to the patents at issue in the prior litigation and not to all the patents at issue in this case.

■■ The general rule regarding the voluntary disclosure of privileged attorney-client communications is that the disclosure waives the privilege as to all other communications on the same subject. *Helman v. Murry's Steaks, Inc.*, 728 F.Supp. 1099, 1103 (D.Del.1990). The rationale underlying the waiver of the attorney-privilege in this situation is one of "fairness." *Kelsey–Hayes Co. v. Motor Wheel Corp.*, 155 F.R.D. 170, 172 (W.D.Mich.1991). Courts have recognized that it would be fundamentally unfair to allow a party to disclose opinions which support its position and to simultaneously conceal those that are unfavorable or adverse to its position. *Saint–Gobain/Norton Indus. Ceramics Corp. v. General Elec. Co.*, 884 F.Supp. 31, 33 (D.Mass.1995)

---

7. The Report of the Special Master provides a more detailed explanation of the prior litigation including the licensing arrangements and the relationship between the parties. I summarize purely for the sake of context.

8. The patents at issue in the prior litigation were U.S. Patent No. 4,792,986 (the '968 patent); U.S. Patent No. 4,845,739 (the '739 patent), U.S. Patent No. 4,930,150 (the '150 patent); U.S. Patent No. 5,073,929 (the '929 patent); U.S. Patent No. 5,014,298 (the '298 patent), and U.S. Patent No. 5,048,075 (the '075 patent.).

■ The scope of the waiver, however, is narrowly construed in patent cases. *Id.* at 34, *see also Applied Telematics, Inc. v. Sprint Corp.,* 1995 WL 567436, at *2 (E.D.Pa. Sept. 21, 1995). Thus, the disclosure of a privileged communication will not serve as a wholesale waiver of the attorney-client privilege Instead, courts will limit the waiver to the subject matter of the disclosure *Applied Telematics,* 1995 WL 567436, at *3 (the "privilege is waived only if facts relevant to a particular, narrow subject matter have been disclosed in circumstances in which it would be unfair to deny another party an opportunity to discover other relevant facts with respect to that subject matter"). A determination as to the scope of the waiver must be made under all the circumstances, including the context in which the disclosure is made and the relative fairness of defining the scope of the waiver to include issues not pursued by the disclosing party. *See Kelsey–Hayes,* 155 F.R.D. at 171 (order compelling disclosure of privileged documents must be made on case by case basis); *see also Applied Telematics,* 1995 WL 567436, at *2–*3 (court limited waiver to opinion relied upon by defendants).

For instance, in *Applied Telematics,* the court addressed whether the reliance on an opinion of counsel to defend against a charge of infringement waived the attorney-client privilege as to all opinions and studies concerning the patent at issue. 1995 WL 567436, at *2–*3. The court held that the waiver only extended to issues relied upon by the defendants in defending against a charge of infringement. *Id.* at *3. In limiting the scope of the waiver, the court noted that the defendants did not challenge the validity, enforceability, scope or interpretation of the patent. *Id.* at *2. The court thus limited the waiver to legal opinions regarding infringement. *Id.* at *3.

Similarly, in *Saint–Gobain,* the court addressed whether the production of the opinions of counsel discussing the validity of the patents waived the attorney-client privilege as to issues of infringement and enforceability as well. 884 F.Supp. at 33–34. The court noted that opinions offered as a defense only discussed the validity, or invalidity, of the patent. Therefore, the court held that the defendants had only waived the attorney-client privilege with respect to opinions on validity. *Id.* at 34.

■ Plaintiffs strenuously argue that the Special Master failed to narrowly define the subject matter of the disclosures and is contrary to law because the Special Master did not limit the subject matter of the disclosures to the purpose for which the disclosure was made. *See Applied Telematics,* 1995 WL 567436, at *2–*3. In so doing, plaintiffs conflate the purpose behind disclosing the documents with the subject matter of the documents. Although the purpose for which a document is disclosed is relevant in determining the scope of the waiver, the subject matter of the disclosure must be determined in reference to the content of the disclosed document. Thus, the scope of the waiver is informed both by the purpose served by the disclosure and the content of the disclosure. *See Saint–Gobain,* 884 F.Supp. at 33–34; *Applied Telematics,* 1995 WL 567436, at *2–*3.

In determining the scope of the waiver, the Special Master correctly limited the scope of the waiver to the patents at issue in the prior litigation. *Heidelberg Harris, Inc. v. Mitsubishi Heavy Indus.,* 1996 WL 514993, at *1–*2 (N.D.Ill. Sept. 6, 1996) (waiver of attorney-client privilege on one patent does not waive privilege on another patent, even if patents are related). To the extent that the Special Master determined that the subject matter of the disclosures encompassed the disclosed concepts underlying the patents at issue in the prior litigation and appearing in the documents, his determination is not clearly erroneous or contrary to law. Indeed, it appears from the answers to interrogatories propounded in the prior litigation that plaintiffs identified some of the same concepts in the disclosed communications in order to establish the conception date of the inventions at issue. (*See* Defendants' Response to Plaintiffs' Objections to the Report and Order of the Special Master, Exh. 19) (answer to interrogatories listing correspondence in which Katz referenced the concepts of "combining digital and voice inputs," "ANI," "multiple formats," "DNIS," and

"transfer to live operator"). Accordingly, I affirm the Order of the Special Master insofar as it requires plaintiffs' to produce the correspondence between Mr. Katz and his patent attorney, Mr. Nilsson, regarding the following concepts: (1) connection to a facility; (2) a designation number; (3) having the caller enter personal identification information; (4) automatic number identification ("ANI"); (5) dialed number identification service ("DNIS"); (6) processing of statistical data to isolate a subset; (7) computation of a caller's score in a game system; (8) the capability of interfacing multiple formats; (9) combining digital and voice inputs; and (10) transfer to live operator.

Although the disclosure of privileged documents waived the attorney-client privilege, as in situations where a party discloses the of the advice of counsel to defend a claim of willful infringement, the waiver is not absolute and has a temporal limitation. *Kelsey–Hayes Co.*, 155 F.R.D. 170, 172 (limiting waiver to opinions and material prepared prior to the date plaintiff filed lawsuit); *see also Dunhall Pharm. Inc. v. Discus Dental, Inc.*, 994 F.Supp. 1202, 1206–06 (C.D.Cal. 1998) (discussing temporal limit on waiver of work product privilege). Here, although the parties dispute the scope of the subject matter of the disclosures, it is undisputed that the disclosures were made to establish the conception dates for various elements of the inventions. Under the circumstances, the purpose of the disclosure cannot be ignored in defining the temporal scope of the waiver. *Kelsey–Hayes*, 155 F.R.D. at 172 ("courts should fashion their orders compelling the production of privileged documents on a case by case basis and consistent with fundamental fairness"). In weighing the considerations of fairness, the balance of competing interests shifts at the time the patent application is filed. It would be fundamentally unfair to extend the scope of the waiver beyond the date of the application because the issue of the conception date of an invention and its necessary elements is constrained to the time period prior to the filing of the application. *See Dunhall Pharm.*, 994 F.Supp. at 1206 (temporal scope of waiver defined by time period of alleged willful infringement); *Kelsey–Hayes*, 155 F.R.D. at 172 (order to produce privileged documents limited to material prepared prior to filing of lawsuit). Thus, the waiver is limited to privileged communications regarding the subject matter of the disclosures prior to the application for the patent has been filed. Plaintiffs must therefore produce communications between Mr. Katz and Mr. Nilsson concerning the subject matter of the voluntarily disclosed documents as defined by the Special Master but limited to the time period prior to the filing of the applications for the patents-in-suit in the prior litigation.[9]

## IV. Conclusion

Based upon the foregoing memorandum, the Report and Order of the Special Master of May 13, 1999, will be affirmed insofar as it is modified by this opinion.

---

**9.** It is unknown whether this comports with the Order of the Special Master. In the Report, the Special Master noted that defendants seeks "access to all communications between Mr. Katz and Mr. Nilsson that relate to these basic concepts or subjects." (Report of Special Master at ¶ 3). The Order states that plaintiffs shall produce the documents sought by defendants in the prior litigation related to the subjects identified by the Special Master but only as they relate to the patents-in-suit in the prior litigation. (Order of Special Master at ¶ 3). Presumably the Order of the Special Master limits the production of documents to the time prior to the filing of the application. To the extent that it does not, the Order is overly broad and is hereby revised in plaintiffs' favor.