JOINT STOCK SOCIETY, "Trade House of Descendants of Peter Smirnoff, Official Purveyor to the Imperial Court," and The Russian American Spirits Company, Plaintiffs,

v.

UDV NORTH AMERICA, INC., and Pierre Smirnoff Company, Defendants.

No. Civ.A. 95–749–GMS.

United States District Court, D. Delaware.

July 11, 2000.

David L. Finger, Wilmington, Delaware, for intervenor Rita Katz Farrell.

M. Duncan Grant, Tara L. Lattomous, Monica Leigh Loftin, Andrea B. Untenberger, Pepper Hamilton, LLP, Wilmington, Delaware, Powell, Goldstein, Frazer & Murphy LLP, Atlanta, GA (James W. Hawkins, Hillary Harp, Todd E. Jones, of counsel), for plaintiffs The Joint Stock Society and The Russian American Spirits Company.

Allen M. Terrell, Jr., Peter B. Ladig, Richards, Layton & Finger, Wilmington, DE, Howrey, Simon, Arnold & White LLP, Washington, DC (William L. Webber, Kenneth W. Brothers, Kelly Clement, Erik Bertin, of counsel), for defendants UDV North America, Inc. and Pierre Smirnoff Company.

### OPINION

SLEET, District Judge.

## I. INTRODUCTION.

On July 1, 1999, this court allowed Rita Farrell, a reporter with Reuters News Service, to intervene in this matter for the specific purpose of challenging the "confidential" designation of over 8,000 pages of material filed under seal in this case. Emphasizing the important First Amendment and common law interests in affording Ms. Farrell timely access to these judicial records, the court appointed a special master to preside over the de-classification process in order to afford Ms. Farrell timely access to the material she desired.

In the months which followed, the special master conducted a series of weekly meetings with the parties in an effort to narrow the documents that were in dispute. As a result of these meetings, roughly six thousand pages of material (or two-thirds of the sealed filings) were voluntarily released from seal by the parties. The vast majority of these documents had been submitted by the plaintiffs in opposition to the defendants' motions for summary judgment.

On August 13, 1999, roughly one hundred documents were submitted for the special master's review. These materials were broken down into the following six categories: discovery materials and motions; vodka formula and process documents; consumer research studies; strategic planning and marketing information; financial information; and information that related to the defendants' activities in Russia. Pursuant to the order of reference, the special master was to "determine whether any of these documents contain[ed] legitimate trade secrets or other proprietary information which [would] warrant their continued 'confidential' designation under the January 26, 1998 protective order issued in this case." After the parties had briefed this issue, the special master heard oral argument. He issued his report and recommendation on January 24, 2000.

The parties have now filed their objections to the report and recommendation. The court has reviewed the record and

finds no error in the overwhelming majority the special master's conclusions. Therefore, his report and recommendation will be adopted in large part, and most of the objections to it which were lodged by the plaintiffs and Ms. Farrell will be overruled. Nevertheless, the court will order that a limited number of the Russian materials be unsealed because even if they were improperly obtained and placed into the record, the defendants have not shown that the disclosure of these materials would subject them to a harm which overrides the important interests at stake. Finally, after reviewing the record, the court will not alter the initial allocation of the special master's fee which split his costs evenly between the plaintiffs and the defendants. The following sections discuss the bases for these rulings in greater detail.

## II. STANDARD OF REVIEW.

■■■ When reviewing the special master's report and recommendation, this court must accept his findings of fact unless they are clearly erroneous; his conclusions of law are reviewed *de novo. See, e.g., Essex County Jail Annex Inmates v. Treffinger,* 18 F.Supp.2d 418, 421 (D.N.J. 1998). Generally, the determination of whether information constitutes a trade secret is a factual one. *See, e.g., North Atl. Instruments, Inc. v. Haber,* 188 F.3d 38, 44 (2d Cir.1999) (applying New York law); *Pate v. National Fund Raising Consultants, Inc.,* 20 F.3d 341, 344 (8th Cir. 1994) (applying Colorado law); *Zoecon Indus. v. American Stockman Tag Co.,* 713 F.2d 1174, 1179 (5th Cir.1983) (applying Texas law). As a consequence, this portion of the special master's findings cannot be disturbed unless a review of the entire record leaves this court "with the definite and firm conviction that a mistake has been committed." *See, e.g., Katz v. AT & T Corp.,* 191 F.R.D. 433, 436 (E.D.Pa. 2000); *accord Treffinger,* 18 F.Supp.2d at 421.

## III. DISCUSSION.

The plaintiffs and Ms. Farrell object to the following portions of the special master's report and recommendation: (1) the standard of review which he applied; (2) his decision to recommend keeping the Russian materials under seal, especially without considering the availability of less restrictive alternatives; (3) his decision to recommend keeping the defendants' consumer research studies and other proprietary information under seal, although they allegedly evince fraud; and (4) his decision to recommend keeping certain vodka formulas under seal, even though these formulas are no longer used by the defendants.[1] Finally, the plaintiffs also object to (5) this court's decision to appoint a special master in the first place and to divide his fee evenly between the parties. The court will address these issues in turn.

### A. The Standard Of Review Applied By The Special Master.

The plaintiffs and Ms. Farrell first contend that the special master should have used a heightened First Amendment or common law standard when conducting his review of the sealed documents (instead of the good cause standard which, they claim, he applied). In particular, these two parties argue that the defendants were obligated to show "an overriding interest based on findings that disclosure is essential to preserve higher values and is narrowly tailored to serve that interest." *See*

---

1. The defendants also level an objection. Specifically, they contend that the plaintiffs lack standing to object to the special master's recommendations because they did not join in Ms. Farrell's motion to unseal portions of the record. Nevertheless, the special master invited the plaintiffs to brief the issues raised by Ms. Farrell's motion, and the defendants did not object to this approach at the time. Given their apparent consent to the plaintiffs' presence in these proceedings, the defendants cannot now claim that the plaintiffs should be prohibited from lodging objections to the report and recommendation issued by the special master.

*Publicker Indus., Inc. v. Cohen,* 733 F.2d 1059, 1073 (3d Cir.1984). Under this more rigorous standard, they argue, several of the documents should be unsealed.

In his report and recommendation, the special master spent six pages discussing the similarities and differences between these varying standards of review. *See* Rept. & Rec. at 5–10. Ultimately, he concluded that, in this instance, the good cause standard imposed by Rule 26 and the strict scrutiny required by the First Amendment effectively merge. *Id.* at 8–9.

█ As the special master observed, under the good cause standard, he was required to examine the materials submitted for his review on a document-by-document basis in order to determine whether the defendants had made a "particularized showing of the need for continued secrecy" by specifically demonstrating that the disclosure of these materials would cause them to suffer a "clearly defined and serious injury." *Id.* at 7–8 (citing, *inter alia, Leucadia, Inc. v. Applied Extrusion Technologies, Inc.,* 998 F.2d 157, 166 (3d Cir. 1993) and *Glenmede Trust Co. v. Thompson,* 56 F.3d 476, 484 (3d Cir.1995)). In conducting this exacting type of analysis, the special master noted, he was essentially engaging a narrowly tailored review of the sealed materials in order to determine whether there was a compelling interest in keeping them under seal. *Id.* at 8–9.

More important, the special master also noted that although Ms. Farrell had a right of presumptive access to view these sealed materials (a right which was only heightened by the recent ruling on summary judgment), this right was not absolute. *Id.* at 10 (citing *Bank of Am. Nat'l Trust & Sav. Ass'n v. Hotel Rittenhouse Assocs.,* 800 F.2d 339, 344 (3d Cir.1986)). For example, the special master pointed out, Ms. Farrell "is not entitled to see trade secrets or other proprietary information if the disclosure of this information would expose the defendants to a competitive injury." *Id.* (citing *Leucadia,* 998 F.2d at 166). The special master also noted

that other interests may outweigh Ms. Farrell's common law right of access to the sealed documents. *Id.* (citing, *inter alia, Littlejohn v. Bic Corp.,* 851 F.2d 673, 678 (3d Cir.1988) and *United States v. Smith,* 776 F.2d 1104, 1113 (3d Cir.1985)).

The special master's citation to *Leucadia* is an important one. There, the Third Circuit held that although the strong, common law right of presumptive access to judicial records is "firmly entrenched" in our legal system, it must nevertheless be "balanced against the factors militating against access." 998 F.2d at 165 (quoting *Hotel Rittenhouse,* 800 F.2d at 344). As the *Leucadia* court explained, one of these factors is whether the documents at issue "contain[ ] trade secrets or other confidential business information...." *Id.* at 166 (citing Fed.R.Civ.P. 26(c) and its good cause standard). Thus, "[t]o overcome the presumption [of access which the common law affords], the party seeking protection must show *good cause* by demonstrating a particular need for protection." *Id.* (quoting *Cipollone v. Liggett Group, Inc.,* 785 F.2d 1108, 1121 (3d Cir.1986)) (emphasis added). In other words, the court must engage in a "careful fact finding [process which] balanc[es] the competing interests" at stake in order to determine whether "the strong presumption of openness can be overcome by the secrecy interests of private litigants." *Id.* at 167.

As a review of the special master's report and recommendation makes clear, this is exactly what he did. He examined each and every document submitted for his review, considering whether the disclosure of the material would cause the defendants to suffer a competitive injury in the marketplace or would violate some other interest they had in keeping these materials under seal. *See* Rept. & Rec. at 9–10. As the special master stated in his conclusion, he

ha[d] taken into consideration Ms. Farrell's rights under the First Amendment. However, while these rights are indeed weighty, they are not absolute.

Instead, they must be balanced against the interests of the defendants in protecting their trade secrets or other sensitive information. Here, the defendants have shown that the disclosure of their vodka formula and process documents, consumer research studies, strategic planning and marketing information, and financial materials would cause them a clearly defined and serious injury. Specifically, competitors who gained access to this information could use it to better position their products in the marketplace while, at the same time, undercutting the position which the defendants have established through the investment of both time and money. Rept & Rec. at 43–44.

 This approach was entirely proper and in accordance with the case law. As the Third Circuit has repeatedly made clear, the focus of the inquiry is aimed at determining whether the party seeking to protect sealed judicial records has specifically demonstrated the need to keep the materials under seal. *See, e.g., Leucadia,* 998 F.2d at 167 (citing *Republic of the Philippines v. Westinghouse Elec. Corp.,* 949 F.2d 653, 663 (3d Cir.1991)); *see also Hotel Rittenhouse,* 800 F.2d at 346 (recognizing that the party seeking protection must make a "particularized showing of the need for continued secrecy"). Obviously, once a party makes this showing, the sealed judicial records should remain shielded from public view (even if the party seeking access has a First Amendment or common law right in viewing the materials).

 Here, the special master concluded that the disclosure of the limited number of materials which the defendants had submitted for his review would cause them to suffer a clearly defined and serious injury. *See* Rept. & Rec. at 15–25, 25–30, 30–34, 34–35, 35–43. He, therefore, recommended that these materials be kept under seal. The court can find no legal error with this approach. *Cf. Leucadia,* 998 F.2d at 166–67 (directing the district court

on remand to "conduct[ ] a document-by-document review" of the sealed materials in the case and "carefully weigh[ ] the factors for and against access," including whether the defendants had demonstrated "good cause" for the protection of the documents because they contained "bona fide trade secrets") (relying on *Cipollone,* 785 F.2d at 1121). Furthermore, after conducting an independent review of the materials submitted to the special master, the court cannot conclude that he clearly erred in finding that the overwhelming majority of these documents contained "legitimate trade secrets or other proprietary information which warrant their continued 'confidential' designation." Most of the sealed materials contain vodka formulas, consumer research studies, strategic plans, potential advertising and marketing campaigns or financial information. *See* Rept. & Rec. at 15–25, 25–30, 30–34, 34–35. The federal courts have consistently held that this type of sensitive commercial information is entitled to confidential protection. *See, e.g., Coca–Cola Bottling Co. of Shreveport, Inc. v. Coca–Cola Co.,* 107 F.R.D. 288, 294 (D.Del.1985) (protecting a secret formula); *KFC Corp. v. Marion–Kay Co., Inc.,* 620 F.Supp. 1160, 1163, 1172 (S.D.Ind.1985) (same); *see also United States v. Dentsply Intn'l, Inc.,* 187 F.R.D. 152, 159 n. 6 (D.Del.1999) (affording protection to corporate strategies, sales plans, and pricing information); *C.A. Muer Corp. v. Big River Fish Co.,* 1998 WL 488007, at *1, *3–4 (E.D.Pa. Aug.10, 1998) (shielding media and advertising schedules from public disclosure). In fact, as the *Leucadia* court made clear, a party is entitled to protect this type of trade secret information from public view through the use of sealed filings. 998 F.2d at 166–67 (noting that the party seeking to maintain the confidentiality of its materials "must make a 'particularized showing of the need for continued secrecy' if the documents are to remain under seal"). For these reasons, the objections by the plaintiffs and Ms. Farrell concerning the standard of review which

the special master applied will be overruled.[2]

The court will also overrule the plaintiffs' objection that the special master erred because he "d[id] not demonstrate on a document-by-document basis the foundations for privilege or confidentiality of those documents still under seal." Although the case law requires the defendants to justify the need for continued protection on an itemized or document-by-document basis, *see, e.g., Grove Fresh Distrib., Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 895, 897 (7th Cir.1994), the cases do not require the courts to justify their decisions by explaining how each and every document filed under seal is deserving of confidential protection. *Cf. Leucadia*, 998 F.2d at 166 (instructing the district court on remand to "conduct[ ] a document-by-document review" of the sealed materials, not a document-by-document justification for its ruling). If the courts were required to provide a document-by-document explanation for their rulings, the work at the district level would grind to a halt every time a motion to modify the protective order governing a complex litigation was filed.

In this case, the record demonstrates that the special master reviewed each and every document filed under seal. He recommended that select pages of certain filings remain under seal while others should be unsealed. *See* Rept. & Rec. at 45–46. Given the exacting manner by which he parsed these documents, the court cannot conclude that his decision to discuss the documents by category, instead of individually, was in error.

Finally, although the plaintiffs allege that the special master "failed to recognize that it was not the [i]ntervenor's burden to prove that the materials should be unsealed," this claim is not supported by the record. The special master repeatedly noted that the defendants had the burden of demonstrating that the disclosure of their materials would cause them a "clearly defined and serious injury" and that the defendants had to make this showing on a document-by-document basis. *See* Rept. at Rec. at 7–9. The special master also concluded that the defendants made this showing with respect to the documents they submitted for his review. *See id.* at 18, 19–20, 23–25, 29–30, 32–34, 34–35, 39–43. While the plaintiffs may disagree with the conclusions reached by the special master, the manner by which he reached these conclusions was entirely proper.[3]

---

2. As an aside, the court notes that, throughout these proceedings, Ms. Farrell has maintained that she has a First Amendment right to view the sealed records which effectively trumps all other interests in keeping the documents under seal. However, "[t]he Supreme Court has made it plain that all persons seeking to inspect and copy judicial records stand on the same footing, regardless of their motive for inspecting such records. Thus, the press has no greater right of access than does the general public." *See Leucadia*, 998 F.2d at 167 (citing *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 609, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978)). In other words, even if Ms. Farrell does have a First Amendment right to view sealed judicial records because she is a member of the press, the scope of this right is no greater than the scope of the common law right of access. As the Third Circuit has explained, this common law right is not absolute and does not extend to materials which, if disclosed, would cause a party to suffer a clearly defined and serious injury. *See id.* at

165–66 (citing *Hotel Rittenhouse*, 800 F.2d at 344 and Fed.R.Civ.P. 26(c)(7)). Thus, even if Ms. Farrell does have a First Amendment right to view sealed judicial filings, this right still does not trump a showing by the party seeking protection that disclosure of the materials will result in a competitive harm or violate some other privacy interest.

3. In passing, the court notes that as a result of the special master's encouragement, the parties entered into a supplemental protective order which afforded Ms. Farrell's counsel access to the sealed documents at issue so that he could provide argument on the materials which the defendants wished to remain under seal. While the plaintiffs seemingly fault the special master for rejecting the arguments which Ms. Farrell's counsel has raised on her behalf, he can hardly be blamed for devising a way to afford this attorney greater access than he was entitled to received under the case law.

For these reasons, the plaintiffs' last two objections concerning the standard of review which the special master applied are overruled.

### B. The Availability Of Less Restrictive Alternatives.

Both the plaintiffs and Ms. Farrell argue that the special master should not have recommended keeping the Russian materials under seal because he had available to him a less restrictive means for addressing the defendants' concerns about the use of these documents. For example, the special master could have recommended that the documents be unsealed while, simultaneously, recommending that the plaintiffs be prohibited from using the materials in the foreign legal actions which they have brought against the defendants.

Neither the plaintiffs nor Ms. Farrell advanced this specific argument before the special master in the briefs which they submitted to him. Instead, the plaintiffs and Ms. Farrell both advocated a wholesale unsealing of every document (or portion of a document) in which they expressed an interest. Of course, at oral argument, counsel for Ms. Farrell did state that the special master should not "squash the First Amendment when there is a least restrictive alternative" available. However, this argument was made in the context of disclosing some of the ingredients used to make the defendants' SMIRNOFF vodka. Because this particular argument was not advanced to advocate the unsealing of any of the Russian information, the court concludes that the special master did not err when he did not consider whether there might be a less restrictive alternative to keeping the Russian materials under seal.

For this reason, the court will overrule this portion of the objection made by the plaintiffs and Ms. Farrell. Nevertheless, in conducting its review of the special master's recommendation on the Russian materials, the court will consider whether there might be a less restrictive alternative to keeping these documents under seal (to the extent that such an alternative is appropriate). *Cf. United States v. Jaramillo*, 714 F.Supp. 323, 332 & n. 5 (N.D.Ill. 1989) (explaining that a district court should conduct a *de novo* review of any portion of a magistrate's report and recommendation to which there are objections, which enables the district judge to consider arguments that may not have been advanced before the magistrate as long as there is no bad faith on the part of the litigants or prejudice to the other side) (citing 28 U.S.C. § 636(b)(1) (1988)).

### C. The Russian Information.

Both the plaintiffs and Ms. Farrell contend that the special master erred in recommending that the materials concerning the defendants' activities in Russia should remain under seal. The plaintiffs claim that, contrary to the special master's conclusions, the Russian information is highly relevant to this case because it serves as evidence of the defendants' egregious misconduct and bad faith which bears on whether the defendants could avail themselves of the defense of laches. Ms. Farrell makes a similar argument, contending that while the Russian materials may be embarrassing to the defendants, embarrassment alone does not justify their continued sealing. *See, e.g., Westinghouse*, 949 F.2d at 663 (holding that concern for a "company's public image ... is not enough to rebut the presumption of access").

At the outset, the court notes that the overwhelming majority of the Russian materials which were submitted in opposition to the defendants' summary judgment motions were obtained *after* a July 6, 1998 ruling by the district judge who presided over this litigation prior to its reassignment. As the parties were on the verge of traveling to Europe to conduct a series of depositions, they appeared before the court to discuss, *inter alia*, the topics which these witnesses would be addressing during their testimony.

The plaintiffs appear to have been interested in questioning these individuals, who were all employees in the defendants' European operations, about "various egregious efforts on the part of the defendants to interfere with [the plaintiffs'] business [in Russia]." For example, the plaintiffs were seeking evidence which "touch[ed] on the[defendants'] manipulation of the living descendants [of the original Piotr Smirnov] and ... their coercion, their paying off ..., [and] possible bribery of these [living descendants]." In addition, the plaintiffs claimed, the defendants had "offered millions of dollars to the city officials in Moscow in an effort to lease th[e] facility" which was "the actual location in Moscow where pre-revolutionary vodka was manufactured by the [original] P.A. Smirnov company." According to lead counsel for the plaintiffs, these efforts by the defendants were intended to "interfere with [his] clients' efforts to lease that facility." He, therefore, wanted to uncover "what [the defendants'] game plan was and why their efforts were being undertaken through [a charitable] foundation [which the defendants had established in Russia]."

After hearing this theory of relevancy, the previous presiding judge ruled that the evidence which the plaintiffs sought to discover was not "sufficient[ly] relevan[t] ... to the issues that the jury [wa]s going to be asked to decide." The judge then added, "[s]o if this is a motion to compel, I'll deny the motion." The court finds no ambiguity in this ruling. To the extent that the plaintiffs were moving to compel deposition testimony concerning the defendants' activities in Russia which may have interfered with the plaintiffs' operations there, this motion was denied because the information being sought was not relevant to any of the issues raised in this litigation. This ruling takes on even greater weight because, at the time that it was issued, the presiding judge had reviewed the briefing on the defendants' first motion for summary judgment, which squarely raised the laches defense.

Despite this clear directive from the court, the plaintiffs turned around and took deposition testimony on some of the very issues that were the subject of the July 6th ruling. For example, on July 9, 1998, the plaintiffs questioned a witness about the defendants' efforts to contact the living descendants of the original Piotr Smirnov who were living in Russia. The following week, the plaintiffs were asking similar questions of two different witnesses. On July 15, 1998, they questioned an employee about the unseemly business tactics of an agent who apparently worked for the defendants. The following day, the plaintiffs questioned a former employee about her contacts with the living descendants of the original Piotr Smirnov. Two weeks later, on July 30, 1998, the plaintiffs questioned a witness about the defendants' efforts to lobby the United States and Russian governments.

All of these questions related to issues which the prior district judge found to be irrelevant. The plaintiffs, however, did not abide by this judge's ruling. Instead, they went forward and posed questions to the witnesses which never should have been asked. Furthermore, the plaintiffs submitted the deposition testimony elicited by these questions in opposition to the defendants' summary judgment motions.

Even if this court were to overlook these serious transgressions, it would still have to point out that, in their papers which opposed summary judgment, the plaintiffs completely failed to demonstrate how the Russian information was relevant to any of the issues which had been presented to the court.

In particular, in opposition to summary judgment, the plaintiffs filed a consolidated answering brief of 215 pages. One of the last pages of this submission provided a list of "evidence" which, the plaintiffs claimed, demonstrated that the defendants had acted in bad faith and, thus, should be precluded from asserting a laches defense. In particular, the plaintiffs claimed that, during the 1990s, the defendants engaged

in a number of egregious acts in Russia to solidify their position in that marketplace. The plaintiffs then issued the sweeping proclamation that these instances of misconduct prevented the defendants from invoking the laches defense because they had acted in bad faith. The plaintiffs, however, completely failed to demonstrate how conduct which occurred in Russia during the 1990s would make the recognition of the laches defense in this case inequitable or otherwise improper.

For example, the plaintiffs provided no explanation as to how conduct which occurred in Russia during the 1990s shed any light on whether the defendants had knowingly misappropriated the SMIRNOFF name in the 1930s or 1940s.[4] Nor did the plaintiffs explain how conduct which occurred in Russia during the 1990s prevented the French Smirnoffs from vindicating or, at the very least, attempting to exercise any rights which they might have possessed during the 1940s, 1950s, 1960s, 1970s, or 1980s. *Cf. Iwanowa v. Ford Motor Co.*, 67 F.Supp.2d 424, 467 (D.N.J. 1999) (explaining that equitable tolling of a statute of limitations may be appropriate where a defendant has "actively misled" a

plaintiff or concealed the harm); *Kusek v. Family Circle, Inc.*, 894 F.Supp. 522, 530–31 (D.Mass.1995) (noting that a statute of limitations may be equitably tolled when a defendant has lulled the plaintiff into inaction). Furthermore, the plaintiffs could not have made this showing because, by definition, events which occurred in the 1990s could not have possibly prevented the French Smirnoffs from taking action in any of the five preceding decades.

Instead, the plaintiffs simply made the blanket statement that bad acts (whatever their nature and whenever they occur) automatically translate into bad faith. The plaintiffs, however, cited no authority for this proposition.[5] Nor did they provide any argument on the subject. In fact, the plaintiffs only provided one sentence on the topic in their opposing papers. Specifically, the plaintiffs claimed that the "[d]efendants' bad faith conduct ... [wa]s relevant not only to [the] laches defense but also [the] fraud claims."[6]

The plaintiffs have provided little more in these proceedings, stating only that the Russian materials "are quite relevant to

---

**4.** In their opposition to the defendants' motions for summary judgment, the plaintiffs claimed that, in the 1990s, the defendants confirmed what they had known all along—namely, they knew they had no right to use the SMIRNOFF name because the "rights" which they obtained in the 1930s and 1940s were invalid. *See Joint Stock Soc'y*, 53 F.Supp.2d at 721. However, the plaintiffs did not cite to the Russian materials to support this contention. Instead, the plaintiffs relied on other evidence (such as the many lawsuits and other proceedings in which the defendants were involved) to support this allegation.

In any event, when the court ruled on the defendants' dispositive motions, it assumed that the defendants had knowingly misappropriated the marks which, as numerous federal courts have held, is the focus of the bad faith inquiry. *See, e.g., Harley–Davidson, Inc. v. Estate of O'Connell*, 13 F.Supp.2d 271, 279 (N.D.N.Y.1998); *Davidoff Extension S.A. v. Davidoff Comercio E Industria Ltda.*, 747 F.Supp. 122, 132 (D.P.R.1990); *Armstrong Cork Co. v. Armstrong Plastic Covers Co.*, 434

F.Supp. 860, 871 (E.D.Mo.1977); *Alfred Dunhill of London, Inc. v. Kasser Distillers*, 350 F.Supp. 1341, 1368 (E.D.Pa.1972). Thus, the relevance of the Russian materials on this point is questionable at best.

**5.** The only case which the plaintiffs cited that was remotely connected to this topic, *Cuban Cigar Brands N.V. v. Upmann Intn'l, Inc.*, holds that a defendant must show more than mere delay in order to successfully invoke the defense of laches. 457 F.Supp. 1090, 1097–98 (S.D.N.Y.1978). As *Cuban Cigar Brands* makes clear, the defendant must also show prejudice, which requires more than "the simple fact that the business continued during the period of delay." *Id.* at 1098. This court recognized as much in its summary judgment ruling when it discussed the extreme economic and evidentiary prejudice which the defendants would suffer if this case were allowed to go forward. *See Joint Stock*, 53 F.Supp.2d at 712–13, 717–21.

**6.** Of course, given the nature of the court's ruling, the merits of the plaintiffs' fraud claims were not addressed.

numerous issues in this case, including several that were specifically addressed by the district court in its ruling[ ] on summary judgment."

The plaintiffs cannot carry their burden with this type of "perfunctory and undeveloped argument." *See United States v. Berkowitz,* 927 F.2d 1376, 1383–84 (7th Cir.1991). Nor can they expect the court to carry their burden for them by constructing an argument on their behalf. *See Edward E. Gillen Co. v. City of Lake Forest,* 3 F.3d 192, 196 (7th Cir.1993) (citing *Burdett v. Miller,* 957 F.2d 1375, 1380 (7th Cir.1992)).

The plaintiffs submitted the Russian materials in opposition to the defendants' motions for summary judgment. Yet, to this day, they are still unable to explain how the information contained within these documents bears on any of the issues which were under consideration at the time of the court's ruling. Simply stating that information contained within the Russian materials is relevant to the issues in this litigation is not the same as demonstrating how this information actually bears on the matters at hand.[7] The court finds the plaintiffs' sweeping statements of relevancy without any supporting argument on the matter even more inappropriate since the vast majority of the Russian information was obtained *after* the district judge who was originally assigned to this case explicitly found the information which the plaintiffs were trying to obtain to be irrelevant to the issues in this case.[8]

Nevertheless, Ms. Farrell correctly points out that, relevant or not, the Rus-

sian materials were submitted in opposition to the defendants' motions for summary judgment. As a result, they have become part of the record, which was reviewed in its entirety before the court issued its decision on summary judgment. *See Joint Stock,* 53 F.Supp.2d at 701.

The Third Circuit has explained that the public's need to scrutinize the basis for this court's dispositive ruling on summary judgment is extremely important because this type of review serves as "one of the numerous 'checks and balances' of our system" which provides an "effective restraint on the possible abuse of judicial power." *See Westinghouse,* 949 F.2d at 660–61 (quoting *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 592, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (Brennan, J., concurring)); *accord Joy v. North,* 692 F.2d 880, 893 (2d Cir.1982) ("[D]ocuments used by parties moving for, or opposing, summary judgment should not remain under seal absent the most compelling reasons.") (cited in *Westinghouse* ); *cf. In re Policy Mgt. Sys. Corp.,* Nos. 94–2254 and 94–2341, 1995 WL 541623, at *7 (4th Cir. Sept.13, 1995) (Michael, J., dissenting) ("If a judge can seal documents without notice, then only a mind reader could contest the judge's decision. In short, the judge has been shielded from public scrutiny.") (unpublished decision). As the *Westinghouse* court explained,

> access to judicial records promotes public health and safety by not allowing secrets hidden in court records to be shielded from public view. In addition, public access to judicial records discourages parties from denying the existence

---

**7.** Although both the plaintiffs and Ms. Farrell argue that the Russian information must be relevant because the defendants did not move to strike it from the record, the court notes that the defendants had little need to strike irrelevant and scandalous materials which had been filed under seal since it was automatically shielded from public view.

**8.** Although some deposition testimony concerning the defendants' activities in Russia was taken two days before the July 6, 1998 ruling on the relevancy of these materials, the

court notes that this testimony was submitted under seal in support of one of the defendants' motions for a protective order. As the Third Circuit has explained, there is not presumptive right of access to discovery motions or their supporting materials. *See Leucadia,* 998 F.2d at 165. For this reason, the court will allow this deposition testimony to remain under seal. For the same reason, Exhibit Nos. 5, 8, and 10 to the plaintiffs' August 11, 1998 letter shall remain under seal as well.

of certain documents in subsequent litigation, thus encouraging "greater integrity from attorneys and their clients." Access to civil proceedings and records also acts as a valuable source of information in civil cases that have a "public" character. . . .

Finally, . . . by opening the judicial process to greater public scrutiny, access to the judicial process reinforces the democratic ideals of our society. Public access provides greater opportunities for the public to become educated about the workings of the civil judicial process. In addition, access to judicial proceedings and records helps to impart legitimacy to the pronouncements of our rather insulated federal judiciary.

Applying these general principles to this case, it is apparent . . . that the public interest encompasses the public's ability to make a contemporaneous review of the basis of an important decision of the district court[, such as a ruling on summary judgment].

949 F.2d at 664 (citations omitted); *see also Littlejohn,* 851 F.2d at 682 ("Public access serves to promote trustworthiness [in] the judicial process, to curb judicial abuses, and to provide the public with a more complete understanding of the judicial system, including a better perception of its fairness.") (citing *Publicker,* 733 F.2d at 1069–70); *Hotel Rittenhouse,* 800 F.2d at 345 (noting how public access to judicial records promotes public awareness of and confidence in the judicial system).

■ Thus, Ms. Farrell is essentially arguing that even though the Russian materials were obtained in violation of a prior ruling by the court and even though the information contained within these documents was not relevant to any of the issues addressed in court's decision on summary judgment, the public still has the right to view the materials so that it can reach its own conclusion about the propriety of the court's decision on these tangential matters. Put differently, it would seem that Ms. Farrell is claiming that while the court

decided that the evidence, which was improperly submitted by the plaintiffs, failed to create a genuine issue of material fact on the good faith (or bad faith) element of the laches defense, the public still has the right to engage in its own critique of the court's decision on this matter. The court agrees.

As the Third Circuit has explained, allowing the public to

exercise . . . its common law access right in civil cases promotes public confidence in the judicial system. As with other branches of government, the bright light cast upon the judicial process by public observation diminishes the possibilities for injustice, incompetence, perjury, and fraud. Furthermore, the very openness of the process should provide the public with a more complete understanding of the judicial system and a better perception of its fairness.

*See Littlejohn,* 851 F.2d at 678 (citation omitted) (cited in *Westinghouse,* 949 F.2d at 660).

In other words, "[a]ccess to civil proceedings and records promotes 'public respect for the judicial process' and helps to assure that judges perform their duties in an honest and informed manner." *See Westinghouse,* 949 F.2d at 660 (citing, *inter alia, Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 606, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982)). In this respect, Ms. Farrell is entirely correct, even though this court has concluded that the Russian materials are irrelevant to the issues addressed on summary judgment, the public has the right to come to its own conclusion about the propriety of the court's ruling on the matter. Thus, affording Ms. Farrell access to the Russian documents vindicates not only her rights and interests as a reporter but also the higher goals which those rights and interests are intended to serve.

■ As the Third Circuit has explained, "the right of access [to judicial records] is not determined by whether evi-

dence is properly admitted" into the record. *See Littlejohn,* 851 F.2d at 679 n. 11 (citing *United States v. Criden,* 648 F.2d 814, 828 (3d Cir.1981)). In fact, as another district court has stated, "all materials that are the subject of an evidentiary ruling by the court, whether or not found admissible, are part of the record for purposes of the public's right to inspect and copy." *See Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* Ltd., 529 F.Supp. 866, 899 (E.D.Pa.1981). As a consequence, even though the Russian materials were not relevant to the issues presented to the court on summary judgment, Ms. Farrell nevertheless has a right to examine these documents.

▮ Of course, as the Third Circuit has made clear, the scope of this right is not absolute. *See, e.g., Leucadia,* 998 F.2d at 165 (citing *Hotel Rittenhouse,* 800 F.2d at 344); *Westinghouse,* 949 F.2d at 662 (citing same). Instead, the court must weigh the public's interests against any countervailing concerns that militate against the disclosure of these materials, such as whether the dissemination of this information would subject the defendants to a serious risk of competitive injury or whether the disclosure of these materials might violate some other important privacy interest. *See, e.g., Leucadia,* 998 F.2d at 165–67; *see also Westinghouse,* 949 F.2d at 662–63 (distinguishing trade secret information that might cause a competitive injury if disclosed from general business information which might simply be embarrassing to the corporation if made public); *Publicker,* 733 F.2d at 1073–74 (same).

Furthermore, the court has its own interests in protecting the integrity of its processes. *See Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) ("Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes."). As the United States Supreme Court has explained,

pre-trial discovery by depositions and interrogatories has a significant potential for abuse. This abuse is not limited to matters of delay and expense; discovery also may seriously implicate privacy interests of litigants and third parties. . . .

There is an opportunity, therefore, for litigants to obtain—incidentally or purposefully—information that not only is irrelevant but if publicly released could be damaging to reputation and privacy. The government clearly has a substantial interest in preventing this sort of abuse of its processes.

*See Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 34–35, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984).

The court will weigh these competing interests in the following sections. In order best analyze the Russian materials, the court will break these documents down into the following three sub-categories: (1) materials addressing the conduct of Spirous Economou, one of the defendants' employees or agents in Russia; (2) information concerning the activities of the Smirnoff Fund and the Smirnoff Foundation in Russia, and (3) documents relating to the lobbying efforts of the defendants in the United States and Russia.

1. The activities of Spirous Economou in Russia.

▮ In the early 1990s, a man by the name of Spirous Economou worked for the company which distributed the defendants' SMIRNOFF vodka in Russia. Apparently, he served as a consultant who advised the defendants on how to conduct business in Russia. To say the least, his tactics were extreme. While the public disclosure of his practices may prove embarrassing for the defendants, this court cannot conclude that the dissemination of this information would subject them to a competitive harm. *Cf. Westinghouse,* 949 F.2d at 663 (explaining that concern for "the company's public image . . . is not enough to

rebut the presumption of access"). For example, the defendants have not argued that the Economou materials contain trade secrets, such as confidential strategic plans or sensitive financial or marketing information. *See, e.g., Leucadia,* 998 F.2d at 166 (citing Fed.R.Civ.P. 26(c)(7)). Instead, it would appear that this information simply serves as evidence of "poor management" which "is hardly a trade secret." *See Publicker,* 733 F.2d at 1074 (quoting *Joy,* 692 F.2d at 894).

Nevertheless, even though this information is not relevant to any of the issues in this litigation, the court does recognize that the Economou materials may bear on some of the matters which have arisen in the numerous foreign lawsuits between the parties, especially the Russian litigation. Thus, the court is sensitive to the concerns which the defendants have expressed. However, it would seem that the best way to address these concerns would be to prohibit the plaintiffs from using the Economou materials in any other litigation without first obtaining approval from this court. *See* D.I. 237 at 10–11 (discussing the approach originally adopted by the district judge who was first assigned to this case); *see also* Fed.R.Civ.P. 26(c) (allowing the court to regulate the use of discovery materials). While the defendants would undoubtedly prefer a more stringent ruling, the court believes that this one satisfies the competing interests of all the parties involved in this dispute.

For example, although the plaintiffs have recently offered to "seek" or "negotiate" a consent order before the Russian courts which would prohibit them from using the Economou materials in their lawsuit over there, there is no indication these efforts would meet with any success (especially since, as lead counsel for the plaintiffs admits, he is not involved in those proceedings). Furthermore, although it would appear that an order by this court which prohibits the plaintiffs from using the Economou materials in their foreign lawsuits against the defendants might not be consistently enforced by the courts of these various jurisdictions, this court has the ability to enforce its own orders. Thus, to the extent that the plaintiffs simply begin using the Economou materials in other lawsuits without first seeking leave from this court, their conduct would be in violation of this ruling and subject to sanctions. Although this approach may not be able to prevent the information contained within the Economou materials from becoming part of a public relations campaign or lobbying effort against the defendants in Russia or the United States, the court believes that its ruling does address the defendants' primary concern that the documents might be used as evidence in the Russian litigation or any of the other lawsuits which the plaintiffs have filed against the defendants.

In addition, as a member of the press, Ms. Farrell is entitled to review and write about the Economou materials and their role in this case. As mentioned earlier, while this court has found that this information contained within these documents is not relevant to this litigation, the public has a right to reach its own conclusion on this matter. Of course, the only way to achieve this result is to release the materials from seal.

Finally, while the disclosure of the Economou materials may prove somewhat embarrassing for the defendants, they are not likely to suffer a competitive injury from the dissemination of this information. As previously explained, these documents discuss only questionable business tactics, not actual strategic or economic plans. Thus, there is little concern that competitors will begin modeling their practices after the approach which Economou implemented in Russian during the 1990s. Although the defendants also argue that any ruling which releases the Economou materials from seal will discourage future litigants from entering into protective orders because they could no longer count on these agreements to preserve the confidentiality of sensitive materials, the court again

notes that the materials which the defendants seek to protect do not contain the type of information which Rule 26(c)(7) was intended to protect. *See, e.g., Westinghouse,* 949 F.2d at 663 (drawing a distinction between trade secrets or other proprietary information and materials which might simply be embarrassing to a corporation); *cf. Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 787 (3d Cir. 1994) ("While preventing embarrassment may be a factor satisfying the 'good cause' standard . . . , 'it may be especially difficult for a business enterprise, whose primary measure of well-being is presumably monetizable, to argue for a protective order on this ground.' ") (quoting *Cipollone,* 785 F.2d at 1121).

For these reasons, the deposition testimony discussing the Economou's conduct in Russia will be unsealed.

2. The activities of the Smirnoff Fund and the Smirnoff Foundation in Russia.

██ The plaintiffs and Ms. Farrell also seek to unseal materials concerning the activities of the Smirnoff Fund and the Smirnoff Foundation. These entities appear to be charitable foundations which the defendants established in Russia to perform "good works" throughout that country. One division of these charities provides financial assistance to the living descendants of the original Piotr Smirnov.

The irrelevancy of this information was squarely addressed by the prior judge's July 6, 1998 ruling. There, the plaintiffs were arguing that the defendants "bribed" these descendants, paying them off to obtain their loyalty in any future legal action which might be brought by or against the defendants. In direct response to this argument, the presiding judge ruled that the information which the plaintiffs were trying to obtain was not relevant. Therefore, he ruled that, to the extent that the plaintiffs had moved to compel, their motion was denied. Nevertheless, during the European depositions which followed, the plaintiffs took extensive testimony on the organization and activities of the Smirnoff Fund and Smirnoff Foundation, including their public relations activities and the nature of their agreements with the living Smirnov descendants.

The court views this information as being akin to sensitive marketing or advertising information or confidential customer lists which have historically received trade secret protection. *See, e.g., Dentsply,* 187 F.R.D. at 159 n. 6 (protecting customer contracts, customer lists, corporate strategies, sales plans, and pricing information); *C.A. Muer,* 1998 WL 488007, at *3–4 (shielding media and advertising schedules from public disclosure). As defense counsel explained when the issue of the Russian materials first surfaced in this litigation, affording the plaintiffs access to these types of materials would give them a competitive windfall by enabling them to discover the identities of the defendants' allies and their enemies in Russia. Furthermore, a better understanding of the Smirnoff Fund and the Smirnoff Foundation might enable the plaintiffs to take steps which counteract · the activities of these organizations in Russia and the coverage that they receive in the press. Also, some of the deposition testimony concerns key components of the defendants' promotional strategy. As the special master explained, this information is central to the defendants' advertising and marketing campaigns, and its disclosure would subject the defendants to a serious competitive injury. *See* Rept. & Rec. at 32–33. Given the potential adverse consequences which the disclosure of this portion of this set of materials might cause to the defendants' competitive efforts in Russia and the United States, the court will allow these documents to remain under seal.

3. The activities of the defendants in lobbying the United States Government concerning events in Russia.

██ The last category of Russian information which the plaintiffs and Ms.

Farrell seek to unseal is deposition testimony concerning the lobbying efforts undertaken by the defendants in the United States and Russia. Prior to the commencement of the European depositions, the plaintiffs argued that these lobbying efforts were relevant to the issues in this case because they were indicative of "an effort to interfere with" the plaintiffs' operations in Russia. The district judge who presided over this case before its reassignment, however, concluded that this information was not relevant to any of the issues in this case. Nevertheless, the plaintiffs again took testimony on this topic during the subsequent round of European depositions. They also submitted the information which they elicited during these depositions in opposition to the defendants' motions for summary judgment.

Although this information is not relevant to any of the issues in this litigation, the court fails to see how the disclosure of these lobbying activities harms the defendants in any way. First, they would appear to be immune from suit for any conduct which they undertook in the United States. *See Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) ("The right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws cannot properly be made to depend upon their intent in doing so. It is neither unusual nor illegal for people to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors."); *see also Mine Workers v. Pennington*, 381 U.S. 657, 669, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) ("*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent of purpose."). *Cf. Westinghouse*, 949 F.2d at 662–63 (explaining that "serious competitive harm" is the focus of the analysis).

Again, as with the Economou materials, the court will unseal the documents con-

cerning the defendants' lobbying efforts. However, the court will also prohibit the plaintiffs from using these materials in any other litigation without first obtaining approval from this court.

4. The defendants' request for a stay.

■ Finally, for obvious reasons, the defendants have asked this court to stay any ruling which orders any of their materials to be released from seal. *Cf. In re Ford Motor Co.*, 110 F.3d 954, 963 (3d Cir.1997) ("[O]nce putatively protected material is disclosed, the very 'right sought to be protected' has been destroyed.") (relying on, *inter alia, Glenmede*, 56 F.3d at 483–84; *Smith v. BIC Corp.*, 869 F.2d 194, 198–99 (3d Cir.1989)). When considering whether to grant a stay, this court must take into account: (1) whether the party seeking the stay is likely to succeed on the merits or be irreparably harmed if a stay is not issued; (2) whether the issuance of a stay will substantially injure the other parties; and (3) the interests of the public in the matter. *See Westinghouse*, 949 F.2d at 658.

■ As the *Westinghouse* court emphasized, Ms. Farrell and the public clearly have important interests in viewing materials that were part of the summary judgment record. *Id.* at 660–61, 664. However, it is equally clear that once these materials are unsealed, any rights or interests which the defendants are seeking to protect will evaporate. *See, e.g., Bogosian v. Gulf Oil Corp.*, 738 F.2d 587, 591 (3d Cir.1984) ("When a district court orders production of information over a . . . claim of a privilege not to disclose, appeal after a final decision is an inadequate remedy . . . for compliance with the production orders complained of destroys the right sought to be protected.") (citations omitted).

For this reason, the court will stay its ruling on the disclosure of the Russian materials which discuss Economou's activities and the defendants' lobbying efforts for a period of ten days in order to afford the defendants an opportunity to pursue

an immediate appeal of this ruling in the Third Circuit. *See Westinghouse*, 949 F.2d at 658. Neither the plaintiffs nor Ms. Farrell object to this approach.

### D. The Consumer Research Studies And Other Business Information Which Allegedly Evince Fraud.

The plaintiffs next claim that the special master erred in recommending that a number of the defendants' consumer research studies, strategic plans, and marketing information should remain sealed. According to the plaintiffs, this recommendation runs contrary to Delaware Rule of Evidence 507 which states that the trade secret privilege should not be recognized if it would "tend to conceal fraud or otherwise work injustice". Del.R.Evid. 507 (1999). The special master, however, rejected the plaintiffs' argument for three reasons.

 First, he noted that the plaintiffs had obtained access to these materials during the course of this litigation and had submitted these documents in opposition to the defendants' motions for summary judgment. Thus, they did not suffer any "injustice" because they were able to use the materials in their prosecution of this lawsuit. *See* Rept. & Rec. at 27, 32.

Second, the special master observed that the ruling on summary judgment addressed the fundamental issues of justiciability, standing, and laches. The ruling did not touch on the merits of the case, such as whether the plaintiffs had submitted sufficient evidence to create a genuine issue as to whether the defendants had engaged in false or misleading advertising. Consequently, the special master concluded, the unsealing of the defendants' commercial information would not assist the public in evaluating the summary judgment opinion. *Id.* at 28–29, 32 (citing *Westinghouse*, 949 F.2d at 664).

Third, the special master found that the defendants' consumer research studies, strategic plans, and marketing information contained information which the defendants had taken reasonable steps to protect and which, if disclosed, would subject the defendants to a competitive harm because other firms in the alcohol industry could use the information to their advantage. *Id.* at 29–30, 32.

For these reasons, the special master recommended keeping the materials under seal. The court finds no error with the special mater's approach or his conclusions.

Rule 507 of the Delaware Rules of Evidence allows a party to invoke a trade secrets privilege as long as the recognition of that privilege would not "tend to conceal fraud or otherwise work injustice." Del. R.Evid. 507. Furthermore, the Rule requires the courts to "take such protective measures as the interest of the holder of the privilege and of the parties and [as] the interest of justice may require" when disclosure is directed. *Id.*

The special master concluded that even though Rule 507 is a state rule of evidence, it nevertheless should be considered as part of the legal analysis since Delaware law provides the substantive rule of decision on the trade secret issue. *See* Rept. & Rec. at 26. Although the parties dispute the proper scope of Rule 507, they apparently agree that the rule itself should be applied in this case. *Cf. Upjohn Co. v. Hygieia Biological Labs.*, 151 F.R.D. 355, 358–59 (E.D.Cal.1993) (applying California's version of the rule in a discovery dispute in an unfair competition case that was pending in federal court); *Auto Owners Ins. Co. v. Totaltape Inc.*, 135 F.R.D. 199, 203 (M.D.Fla.1990) (applying Florida's version of the rule in a declaratory judgment action based on diversity jurisdiction).

Several states have their own version of Rule 507. *See, e.g., In re Continental General Tire, Inc.*, 979 S.W.2d 609, 610–11 & n. 1 (Tex.1998); *see also Inrecon v. Village Homes at Country Walk*, 644 So.2d 103, 105 (Fla.Dist.Ct.App.1994); *Bridgestone/Firestone, Inc. v. Superior Court*, 7

Cal.App.4th 1384, 1390, 9 Cal.Rptr.2d 709 (Cal.Ct.App.1992). The Texas Supreme Court in *Continental General Tire* provided an exhaustive analysis of the scope of this rule. 979 S.W.2d at 610–13 (relying on, *inter alia*, *Bridgestone/Firestone*, 7 Cal.App.4th at 1391–93, 9 Cal.Rptr.2d 709). Ultimately, the court concluded that:

> [The] trade secret privilege [afforded by Rule 507] seeks to accommodate two competing interests. First, it recognizes that trade secrets are an important property interest, worthy of protection. Second, it recognizes the importance ... place[d] on [the] fair adjudication of lawsuits.... Rule 507 accommodates both interests by requiring a party to disclose a trade secret only if necessary to prevent "fraud" or "injustice." Stated alternatively, disclosure is required only if necessary for a fair *adjudication* of the party's claims or defenses.
>
> We therefore hold that trial courts should apply Rule 507 as follows: First, the party resisting discovery must establish that the information is a trade secret. The burden then shifts to the requesting party to establish that the information is necessary for a fair *adjudication* of its claims. If the requesting party meets this burden, the trial court should ordinarily compel disclosure of the information, *subject to an appropriate protective order.* In each circumstance, the trial court must weigh the degree of the requesting party's need for the information with the potential harm of disclosure to the resisting party.

*Id.* at 612–13 (footnoted omitted) (emphasis added).

As this approach makes clear, the "fraud" or "injustice" which Rule 507 is intended to prevent, especially during the pre-trial stage, is the possibility that a party will not be able to effectively litigate its case because relevant information is being withheld by the other side. The special master came to this very conclusion in his report and recommendation. *See* Rept. & Rec. at 26–28 (citing *In re Attor-*

*ney General's Investigative Demand to Malemed,* 493 A.2d 972, 975–76 (Del.Super.1985)). Noting that the plaintiffs had obtained the very of access to the defendants' commercial information which Rule 507 was intended to provide, the special master properly concluded the plaintiffs had not suffered any injustice in this case. *Id.* at 27, 32.

As to the issue of alleged fraud, it is one that this court has never reached, and the court will not address this issue here. As the special master correctly noted, the court's dispositive ruling makes it clear that "even if the defendants were engaging in false advertising or other unfair competitive practices, the plaintiffs [a]re not the ones to recover due to the deficiencies of their case." *Id.* at 29. Specifically, they have failed to present the court with a justiciable case or controversy, lack standing to pursue their claims, and are barred from bringing this lawsuit under the doctrine of laches. *See Joint Stock Soc'y,* 53 F.Supp.2d at 701–07, 707–12, 712–22. The defendants' commercial information has no bearing on these first two issues because they turn solely on the plaintiffs' position in the marketplace. Furthermore, while the commercial information at issue could be seen as touching on the good faith element of the laches defense, as this court has explained, the defendants were entitled to invoke laches regardless of the cleanliness of their hands since any other ruling would inequitably confer a windfall upon the plaintiffs. *Id.* at 721–22.

In addition, the special master found that the public disclosure of these materials would do injustice to the defendants because the information which the plaintiffs sought to unseal would give competitors new insights into the factors which determine how SMIRNOFF vodka is advertised, distributed, and marketed. *Id.* at 29–30, 32–34. The competitive harm to the defendants in this instance is obvious. Once competing firms in the alcohol industry obtained this information, they could incorporate it into their own strategic

plans and, thus, better position their products in the marketplace to the defendants' detriment.

Weighing these competing interests, the special master decided to recommend keeping the challenged portions of the defendants consumer research studies, strategic plans, and marketing information under seal. The court finds no factual or legal error in this approach. Therefore, the plaintiffs objections to it are overruled.

### E. The Vodka Formulas Which The Defendants' No Longer Use.

The plaintiffs also contend that the special master erred in recommending that vodka formulas which the defendants no longer use should remain under seal. These recipes describe how to make flavored vodkas and liqueurs. The plaintiffs claim that these formulas have lost their trade secret value because they are not currently used by the defendants.

 The special master rejected this argument because the Delaware Trade Secrets Act affords protections to "any information, including a formula, which 'derives independent economic value, actual or *potential*, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.' " Rept & Rec. at 19 (quoting Del.Code Ann. tit. 6, § 2001(4)(a) (1998)) (emphasis in original). The special master then went on to explain that "even though they are not currently used by the defendants, [the remaining formulas] have this type of 'potential' value." For example, the special master took notice that flavored vodkas are the newest trend in the vodka market. *Id.* (citing newspaper articles). Thus, releasing the old recipes from seal would confer a windfall upon the defendants' competitors, which include the plaintiffs, because these companies "could use the information to begin making their own flavored vodkas." *Id.* In addition, the special master noted, the public disclosure of this information would deprive the de-

fendants of "the opportunity to license these formulas to a company that was interested in producing flavored vodkas." *Id.* For these reasons, he recommended that these documents remain under seal.

The court finds no error in this conclusion. While the plaintiffs claim that the potential value of this information "must be real and not just a hypothetical possibility," the court notes that the primary case which the plaintiffs cite for this proposition holds that:

> [A] trade secret may consist of a compilation of information that is continuously used or *has the potential to be used* in one's business and that gives one an opportunity to obtain an advantage over competitors who do not know of or use it. . . .
>
> . . . . .
>
> . . . Although [the defendant] baldly asserts that th[e] information is so stale as to preclude protection, trade-secret status may continue *indefinitely* so long as there is no public disclosure.

*See Enterprise Leasing Co. of Phoenix v. Ehmke,* 3 P.3d 1064, 1068 (Ariz.App.1999) (citing, *inter alia,* citing Arizona's Uniform Trade Secrets Statute and *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 476, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974)) (emphasis added).

Here, as the special master noted, there has been no public disclosure of the defendants' old vodka recipes. In addition, he found, the defendants have taken reasonable efforts to protect this information from disclosure. Finally, he concluded that because the materials themselves have the potential to confer independent economic value upon the defendants, these vodka formulas should remain under seal. This ruling was entirely proper. Although these vodka recipes may be old, they are nevertheless a source of potential value to the defendants. For these reasons, the plaintiffs' objection concerning these formulas will be overruled.

**F. The Plaintiff's Objections To The Appointment Of A Special Master And The Allocation Of His Fees.**

After the court appointed the special master, the plaintiffs objected to the referral on five separate grounds. Recently, the plaintiffs have renewed these objections. The court will address them here.

**1. The "exceptional circumstances" objection.**

The plaintiffs begin by arguing that the removal or approval of confidential designations fails to amount an "exceptional circumstance" which requires the appointment of a special master. In addition, the plaintiffs contend, even if this task could be considered as being "complex," a congested docket in no way justifies the referral.

The court, however, believes that this portrayal of its ruling takes several statements out of context. Admittedly, in its order, the court did state that, in light of its present schedule, it would be "unable to devote its full attention to the review of the over 8,000 pages of material filed under seal" and, as a result, the appointment of a special master, "who ha[d] the ability to focus all of his energy on this dispute, would best serve the interests of justice in this case." However, the court prefaced these comments by making clear that, under the case law, Ms. Farrell was entitled to obtain swift access to the materials she sought. *See, e.g., Grove Fresh*, 24 F.3d at 895 (noting how "access should be immediate and contemporaneous").

▮▮ In this respect, the primary "exceptional circumstance" requiring the appointment of a special master was not, as the plaintiffs' contend, the court's "congested docket." Instead, it was the directive from higher courts to afford Ms. Farrell timely access to materials which may have been improperly filed under seal. Since this determination required a "very careful" and "particularized" review of each and every one of the thousands of pages of information filed under seal in this case, *see Pansy*, 23 F.3d at 786, the court appointed a special master who could conduct this examination far more quickly than the court would have been able to do. Thus, in the court's view, the circumstances surrounding the appointment of the special master—namely, the thousands of pages of material which had to be "scrutinized" within a fairly short time frame—were sufficiently exceptional to warrant the referral.

In reaching this decision, the court has not discounted the cases upon which the plaintiffs rely. *See La Buy v. Howes Leather Co.*, 352 U.S. 249, 257–59, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957); *Prudential Ins. Co. of Am. v. United States Gypsum Co.*, 991 F.2d 1080, 1085–87 (3d Cir.1993); *Apex Fountain Sales, Inc. v. Kleinfeld*, 818 F.2d 1089, 1096–97 (3d Cir.1987). Instead, the court believes that each one of these decisions is distinguishable from this case.

**a. *La Buy v. Howes Leather Co.***

In *La Buy*, the Supreme Court, on *mandamus* review, reversed a decision by a district court to refer two complex antitrust cases to a special master for trial. 352 U.S. at 259–60, 77 S.Ct. 309. Apparently, the federal judge justified the reference by citing primarily his heavy docket and the complex legal and factual issues presented by the litigation. *Id.* at 259, 77 S.Ct. 309. In response, the Supreme Court stated that "congestion in itself is not such an exceptional circumstance as to warrant a reference to a master. If such were the test, present congestion would make references the rule rather than the exception." *Id.* The Court also pointed out that "most litigation in the anti-trust field is complex." *Id.* Nevertheless, the litigants were still "entitled to a *trial* before a court" of law. *Id.* (emphasis added). In fact, the Supreme Court believed that the complexity of the issues provided a "[co]mpelling reason for trial before a regular, experienced trial judge." *Id.*

Here, the court referred this matter to a special master for the *limited* purpose of determining what materials, if any, should remain under seal in this litigation. This referral in *no* way threatened any party's right to a jury trial since the court resolved that issue on summary judgment. *See Joint Stock Soc'y,* 53 F.Supp.2d at 694. Instead, the ruling placed only non-dispositive issues before the special master. As the court will soon discuss, under *La Buy,* this decision was entirely appropriate since the court may, at times, utilize extra-judicial resources in order to more efficiently and expeditiously discharge its duties to not only specific litigants but also all parties before it. 352 U.S. at 256, 77 S.Ct. 309 (condoning the use of special masters to "aid judges in the performance of special judicial duties as they may arise in the progress of a cause") (citing *Ex parte Peterson,* 253 U.S. 300, 312, 40 S.Ct. 543, 64 L.Ed. 919 (1920)).

### b. *Prudential Ins. Co. of Am. v. United States Gypsum Co.*

In *Prudential,* also considered on *mandamus* review, the Third Circuit reversed a district court's decision to "substitute[ ] a [special] master for the magistrate judge, who had been managing the case for *five* years with the approval of all parties." 991 F.2d at 1085 (emphasis added). In addition, the referral empowered the special master to prepare rulings on, *inter alia,* the motions to dismiss and for summary judgment which were pending in the case. *Id.* at 1081–82 & n. 2, 1084. Thus, the trial judge in *Prudential* not only removed a case from the docket of a judicial officer who was intimately familiar with the litigation but also reassigned it to an individual outside the judiciary who was subsequently allowed to issue dispositive rulings. Here, the court has done nothing of the sort.

First, as the plaintiffs well know, this district's magistrate judge has never presided over any aspect of this case.[9] Second, as previously mentioned, the court limited the special master's authority to the non-dispositive issue of determining whether the materials filed under seal in this case contained legitimate trade secrets or other proprietary information and are therefore deserving of continued protection. Thus, in the opinion of the court, *Prudential* is inapposite.

### c. *Apex Fountain Sales, Inc. v. Kleinfeld.*

Finally, in *Apex,* the Third Circuit reversed the decision by a district court to refer a motion for contempt to a special master because the matter "presented relatively simple questions of fact and law." 818 F.2d at 1096. However, the motion at issue in *Apex* was not an urgent one. Since the offensive conduct had already occurred, only two issues required attention—first, whether the offending party's behavior rose to the level of contempt and, second, if so, what sanction was appropriate. *Id.* at 1098. Thus, *Apex* is also distinguishable from this case.

### d. The Lessons Of The *La Buy, Prudential,* And *Apex* Trilogy.

In light of *La Buy, Prudential,* and *Apex,* the court believes that the central concern in cases where an issue is referred to a special master over the objection of one of the parties is whether the district judge has impermissibly abdicated his or her constitutional powers by authorizing the master, who lacks the "distinct attributes of Article III status," to make dispositive rulings which determine the fundamental rights and interests of the parties. *See, e.g., Stauble v. Warrob, Inc.,* 977 F.2d 690, 693 (1st Cir.1992) (cited with approval in *Prudential,* 991 F.2d at 1087–88); *see also United States v. Microsoft Corp.,* 147

9. In their second objection to the court's order, the plaintiffs argue that this matter should have been referred to the district's magistrate judge instead of a special master. The court will discuss this issue more fully in the next section.

F.3d 935, 954–55 (D.C.Cir.1998) (relying on, *inter alia, In re United States,* 816 F.2d 1083, 1088–91 (6th Cir.1987)).

After reviewing these decisions, the court believes that the *Stauble* court said it best when it stated:

> [T]he Constitution prohibits ... the non-consensual reference of a fundamental issue of liability to an adjudicator who does not possess the attributes that Article III demands. Because Rule 53 cannot retreat from what Article III requires, a master cannot supplant the district judge. Determining bottom-line legal questions is the responsibility of the court itself. Thus, Article III bars a district court, "of its own motion or upon the request of one party," from "abdicat[ing] its duty to determine by its own judgment the controversy presented and devolve that duty upon any of its officers."

To be sure, Article III does not require that a district judge find every fact and determine ever issue of law in a case.... [For example], a master who is appointed to oversee pre-trial discovery will often investigate the parties' compliance with the relevant Federal Rules as part of his ... fact-finding. As long as the district court discerns sufficient supporting evidence and is satisfied that the master applied the correct legal standards, it may relay on the master's report as part of its determination of liability.

Yet, there is an important distinction between such collateral issues, on the one hand, and fundamental determinations of liability, on the other.... The former comprise table setting and table clearing, while the latter comprise the meal itself. As the [Supreme] Court has observed, where a district court does not hear and determine the main course, *i.e.,* the meat-and-potatoes issues of liability, there is an "abdication of the judicial function depriving the parties of a trial before the court on the basic issues involved in the litigation." Because deter-mining a fundamental question of liability goes beyond mere assistance and reaches the essential function identified by Article III, Rule 53 does not allow the responsibility for making such judgments to be delegated to masters (or other persons not of Article III status) in the face of a contemporaneous objection.

977 F.2d at 695 (citations and footnotes omitted).

In accordance with *Stauble,* the court kept the "meat and potatoes" issues of liability on its plate, disposing of them on summary judgment. Afterwards, the court assigned the "table clearing" duty of de-classifying the thousands of pages of materials filed under seal throughout the course of this litigation (but primarily in opposition to summary judgment) to the special master. In fact, as the court suggested to the parties on January 20, 1999, these "collateral ... matters ... [we]re appropriately left to a later day pending ... the court's disposition of the case dispositive issues." In this light, the reference to the special master was entirely appropriate since it was intended to assist the court in performing its duties in the progress of this case. *Cf. La Buy,* 352 U.S. at 256, 77 S.Ct. 309 (citing *Peterson,* 253 U.S. at 312, 40 S.Ct. 543). Thus, the plaintiffs' first objection concerning the reference to the special master is overruled.

2. The "magistrate judge" objection.

The plaintiffs also contend that the court should have referred this matter to the district's magistrate judge instead of to a special master. *Cf. Prudential,* 991 F.2d at 1087. On this point, the plaintiffs seem to claim that the reference was improper in light of their earlier "suggest[ion] ... to assign[ ] the task of resolving issues regarding the propriety of the ... designations of confidentiality," which arose during discovery, to the magistrate. The court, however, has a different recollection

of the plaintiffs' previous proposal—one that is supported by the record.

### a. The January 20, 1999 status conference.

On January 20, 1999, the court met with counsel for both parties to discuss how to best proceed with this lawsuit given the numerous dispositive and non-dispositive motions pending in the case and the need to schedule the matter for trial.

At the time, lead counsel for the plaintiffs raised an issue that had apparently infected this litigation before its re-assignment. Specifically, counsel alleged that the defendants had throughout discovery designated or, in his words, over-designated the majority their documents as "confidential" and, thus, prevented the plaintiffs, who intended to enter the U.S. market and directly compete with the defendants upon successfully prosecuting this lawsuit, from viewing a great deal of material produced during the course of the litigation.

After providing this background, however, lead counsel for the plaintiffs then stated that he "d[id]n't think that it would be a very good use of [the court's] time to get involved in th[is] issue" since the "volume ... [of this material wa]s so large." Instead, counsel preferred the court to devote its attention to the "summary judgment motions and the scheduling of trial." He, therefore, agreed to meet with defense counsel to discuss the possibility of de-classifying certain types of information or documents so that his clients could view this material prior to the upcoming hearing on summary judgment.

Thus, contrary to the plaintiffs' assertions, they *never* raised the issue of referring this discovery dispute to the magistrate directly with the court.[10] Nevertheless, during the status conference, the court did state that it was not inclined to burden the magistrate, whose schedule is dominated by her role as settlement judge for the district, with a discovery dispute which *both* parties had expressed a willingness to resolve on their own.

With this background in mind, the court turns to the plaintiffs' objection concerning the decision to appoint a special master to preside over the de-classification process instead of referring the matter to the magistrate judge.

### b. The *Prudential* decision is distinguishable.

As previously discussed, in *Prudential,* the district court actually took a case away from a magistrate judge who was intimately familiar with the litigation after having managed the matter for more than five years without one objection from any of the parties. 991 F.2d at 1085.

Here, however, this district's magistrate judge has never presided over any aspect of this case. In addition, while the *Prudential* court did note that "[m]uch of the concern over docket congestion has been addressed by the appointment of magistrate judges who are expressly authorized by statute to assist the district court with pre-trial matters, including discovery," *id.* at 1087, the appellate panel also stated that "any contemporary examination of the

---

**10.** Ironically, it was defense counsel who actually broached this topic albeit indirectly.

Specifically, at the commencement of the status conference, defense counsel mentioned that, after speaking with his counterpart about this issue earlier, lead counsel for the plaintiffs recommended referring the matter to the magistrate if the parties could not agree on a series of redactions which would enable the plaintiffs to see at least some of the material filed under seal. However, after defense counsel mentioned this conversation, lead

counsel for the plaintiffs stated that he was willing to "give [meeting with his opponent] one more try" in the hopes of "coming to an agreement" with respect to the types of information or documents that could be de-designated or, at least, shared with the plaintiffs while remaining shielded from the public.

Thus, while it would probably be unfair to say that the plaintiffs abandoned their request for a referral to the magistrate, it does seem that this request was never directly made to the court, at least not by the plaintiffs. .

'exceptional condition' standard must be made in light of ... the *current availability* of magistrate judges to whom Congress has specifically authorized the referral of pre-trial matters." *Id.* (emphasis added). Thus, given the involvement of this district's magistrate judge in criminal proceedings, civil trials, other civil pre-trial matters, as well as her active role in facilitating alternate dispute resolution to the substantial benefit of both litigants and the judges on this court, the decision to refer this matter to a special master was a proper one. Any other ruling would have only further taxed a judicial officer who was and continues to be heavily-burdened. Consequently, the plaintiffs' second objection to the referral is overruled.

### 3. The "notice" objection.

The plaintiffs next take issue with the lack of notice they received concerning the appointment of a special master. In light of its rulings on the objections that have been raised to date, the court does not believe that it erred when it made its *sua sponte* reference. *Cf. Mercer v. Gerry Baby Prods. Co.,* 160 F.R.D. 576, 577, 579 (S.D.Iowa 1995) (referring, on its own motion, a highly contentious wrongful death action with a six-volume file containing over 175 pleadings and "[n]o fewer than 27 motions to compel or for protective orders" to a special master for the "purpose of discovery management").

In passing, the court does note that, unlike the *Mercer* litigation, the file in this case contained over 525 pleadings located in over thirty volumes stretching roughly thirteen feet at the time of the reference.[11] Of these filings, more than eighty related to issues raised on summary judgment. Of these eighty, at least twenty-six were filed under seal. Furthermore, the plaintiffs submitted twenty-one of these twenty-six sealed filings (*i.e.,* roughly eighty percent). In addition, although only a total of

eight motions to compel or for protective orders were filed in this case, several of these motions addressed extremely sensitive and divisive issues which required their sealing. Among these issues were disputes over the Russian information and the defendants' consumer research studies and strategic marketing and planning information. Given this record, the referral of this matter to a special master was appropriate. Consequently, the plaintiffs objections to the reference for lack of notice are overruled.

### 4. The "fee allocation" objection.

Finally, the plaintiffs' claim that the court's initial decision to split the special master's fees and costs evenly between the parties was improper. According to the plaintiffs, the defendants should bear all of the costs associated with the referral.

When the court first appointed the special master, there were approximately 8,000 pages of material filed under seal. Approximately three-quarters of these sealed filings (or 6,000 pages) had been submitted by the plaintiffs in opposition to the defendants' motions for summary judgment. In particular, the plaintiffs submitted two answering briefs, totaling over 300 pages, and more than 20 volumes of appendices, containing more than 5,700 pages. Again, all of these materials were filed under seal in their entirety.

At the time of the referral, the parties pointed fingers at each other, disputing who was actually responsible for such a large-scale sealing of the record. The plaintiffs claimed that the defendants had over-designated their documents as "confidential." As a result, a wholesale sealing of the summary judgment record was necessary. The defendants, however, claimed that the plaintiffs had engaged in over-sealing by placing all their opposing papers under seal without regard to whether or not these materials actually contained

---

**11.** It is worth noting that, of these submissions, fifty-five were filed under seal. Approximately one-half of these sealed filings

were the 6,000 pages of material submitted by the plaintiffs in opposition to summary judgment.

"confidential" information. Because the court was not able to untangle these accusations when it appointed the special master, it made the initial decision to apportion his fees and costs evenly between the parties.

The plaintiffs have taken issue with this approach, claiming that they "should not be forced to pay for a special master [that] they did not cause to be appointed." Instead, the plaintiffs contend, the defendants "should assume all [of the] costs for the reference" because "it is their actions that . . . caused the referral to, and continued employment of, the special master." In support of this argument, the plaintiffs again claim that the defendants over-used the confidentiality designation and are thus "responsible for the sealing of over 98 [percent] of the total volume of sealed materials [in this case], the vast majority of which were never deserving of protection under the protective order." As a result, the plaintiffs contend, they "should not be forced to pay for the defendants' over-designation of their own documents."

Stated mildly, this portrayal fails to accurately characterize the situation. During a July 20, 1999 tele-conference with the special master, lead counsel for the plaintiffs acknowledged that the sealed filings which were submitted in opposition to the defendants' motions for summary judgment had, "in most instances, a combination of both confidential and non-confidential documents within them." Lead counsel continued, "That is why the entirety of volumes here [was] placed under seal." [12] Put differently, the plaintiffs knowingly filed "a number of documents

. . . under seal that [we]re not deserving of any type of confidential protection" because they were attempting to conform their appendices to the layout of their briefs.

As defense counsel clarified during the July 20th tele-conference,

the plaintiffs did file both confidential documents and documents that no one had designated as confidential under seal. There is a substantial volume of documents that the plaintiffs have filed under seal that no one has designated as confidential. In fact, it is over half of the documents that the plaintiffs have filed as exhibits to their summary judgment papers.

To give [the court] an idea of the scope of [the situation], the plaintiffs . . . filed approximately 6,000 pages of materials as exhibits to their summary judgment papers. . . . [A]lthough they filed all of the[se documents] under seal, more than half of them were not designated as confidential by anyone.

The plaintiffs did not dispute this characterization during the tele-conference with the special master. Nor have the plaintiffs pointed to any evidence during these proceedings which calls this portrayal into doubt. As a consequence, it seems as if thousands of pages of documents, which were not deserving of any type of confidential protection, were nevertheless filed under seal by the plaintiffs because it was apparently more convenient to seal all of their papers opposing summary judgment than to separate their appendices into volumes of confidential and non-confi-

---

12. It seems as if the plaintiffs adopted this approach in order to conform their summary judgment appendices to the layout of their accompanying briefs so that the materials "would be mo[re] readable by the court."

By way of illustration, if one section of an answering brief discussed both confidential and non-confidential information, then the corresponding volume of the appendix contained both confidential and non-confidential materials. As a result, the entire volume was placed under seal (even though there might

be only a few pages of confidential information contained within it).

Thus, instead of dividing their appendices into volumes containing confidential information which were filed under seal and volumes containing non-confidential information which could be accessed by the public, the plaintiffs simply placed every volume of their appendices under seal because each one these volumes contained, to some degree, confidential information.

dential material. Thus, it appears that over half of the documents contained within the twenty-one volumes of appendices, *i.e.*, more than 3,000 pages of material, were filed under seal even though *no* party *ever* designated this information as being confidential. Therefore, the statement that the "defendants are responsible for the sealing of over 98 [percent] of the total volume of sealed materials, the vast majority of which were never deserving of protection" is simply inaccurate.

██ By the court's calculation, if roughly 8,000 pages of material have been filed under seal in this case and the plaintiffs are responsible for submitting at least 3,000 of these pages even though they were not designated as containing confidential information, then the *plaintiffs* are the ones who are responsible for sealing at least forty percent of the summary judgment record. Moreover, in light of the record, it seems as if there was no *legitimate* reason for sealing these materials.[13] In addition, it was the wholesale sealing of the summary judgment record by the plaintiffs which prompted Ms. Farrell to file her motion to intervene, and it was Ms. Farrell's need to gain swift access to this

information which necessitated the appointment of the special master. Thus, the plaintiffs' contention that they "did not cause [the special master] to be appointed" because it was the defendants' "actions that . . . caused the referral to, and continued employment of, the special master" is also inaccurate.

Furthermore, after reviewing the record of the proceedings before the special master, it is clear that the plaintiffs voluntarily elected to participate in the de-classification process which was implemented (even though, as the defendants point out, the plaintiffs never formally joined in Ms. Farrell's motion or filed a motion of their own). During this de-classification process, the plaintiffs participated in every conference and hearing in addition to submitting a twenty-seven page brief in opposition to the defendants' motion to keep their selected materials under seal. Moreover, at the oral argument on this motion, the plaintiffs sought and were allowed to voice their position on every issue presented to the special master. Finally, over one-third of the special master's report and recommendation was devoted to ad-

---

**13.** In the opinion of the court, this conduct violated the provision of the governing protective order which states that "[w]here possible, only those portions of filings with the court that contain confidential information shall be filed under seal."

It may have also violated Rule 11 of the Federal Rules of Civil Procedure because, in light of counsel's admission, it does not appear that there was a good faith basis to knowingly file documents, which were *never* designated as confidential by any party, under seal. As Rule 11 emphasizes, by presenting *any* paper to the court, an attorney certifies that, to the best of his or her "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the submission "is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." Fed.R.Civ.P. 11(b)(1) (1999).

Here, in the opinion of the court, the delay and cost resulting from the plaintiffs' filings appear to be incontrovertible. Instead of gaining immediate access to a majority of the

materials filed under seal by the plaintiffs at the time of their respective submissions on June 2, 1998 and September 23, 1998, Ms. Farrell was forced to intervene in this matter in order to compel their disclosure. In addition, during the resulting de-classification process necessitated by Ms. Farrell's motion, the defendants have been put to the additional expense of reviewing these 6,000 pages of sealed material in order to determine which documents were never designated as confidential and, therefore, which ones could be shown to Ms. Farrell immediately. Finally, because lead counsel for the plaintiffs has admitted that, at the time these filings were submitted, he *knew* that "each volume of the appendices would have a combination, in most instances, of both confidential and nonconfidential documents," it seems that he lacked the requisite good faith basis for sealing the entire record.

In light of this record, the court is, to say the least, nonplused by the plaintiffs' attempts to shift the blame for the special master's appointment to the defendants.

dressing issues raised solely by the plaintiffs. *See* Rept. & Rec. at 17–23, 26–30, 32–33, and 38–43. As the special master's ruling makes clear, the plaintiffs took issue with virtually every category of documents submitted by the defendants (with the exception of their financial information). *See id.* at 34–35.

Therefore, for the plaintiffs to now claim that they "were bystanders [in the proceedings before the special master] who gained no benefit from [his] actions concerning Ms. Farrell's motion" is rather disingenuous. As the record demonstrates, the plaintiffs were active participants in the proceedings before the special master. While they may not agree with the conclusions he reached on the issues which they presented to him, it is clear that the special master considered the plaintiffs' arguments and devoted a substantial portion of his report and recommendation to analyzing them.

More important, the special master was not appointed solely for the benefit of the parties. Instead, his appointment was also intended to assist the court in narrowing the issues in dispute. The court has already discussed how, as a direct result of his efforts, Ms. Farrell was able to gain access to nearly six thousand pages of information less than two months after her motion to intervene had been granted. Furthermore, the special master's report and recommendation has provided this court with an excellent analysis of the factual and legal issues which are at the heart of the dispute between the plaintiffs, the defendants, and Ms. Farrell.

For all of these reasons, the court will not alter its earlier decision which requires the plaintiffs to split the special master's fee evenly with the defendants (which results in the cost of $17,812.50 a side). In short, by filing approximately 3,000 pages of material under seal which had never be designated as "confidential" by either party, the plaintiffs are responsible for the improper sealing of at least forty percent of the record and, thus, at least bear partial responsibility for the need to appoint a special master to oversee the de-classification process. In addition, even though Ms. Farrell gained swift access to these 3,000 pages of material, the plaintiffs continued participation in every stage of the proceedings before the special master and continued opposition the sealing of virtually every category of documents submitted by the defendants only served to increase the special master's fees and costs. Given this record, the court finds the apportionment of the special master's fee to be fair and just. For these reasons, the plaintiffs' final objection to the appointment of a special master is overruled.

## V. CONCLUSION.

After reviewing the special master's report and recommendation and the objections to it, the court finds no error in his conclusions concerning the defendants' vodka formula and process documents, consumer research studies, strategic planning and marketing information, or financial materials. Therefore, these portions of the special master's report and recommendation will be adopted, and the objections to them which were lodged by the plaintiffs and Ms. Farrell will be overruled. The court, however, will unseal selected Russian materials—in particular, those concerning Economou's activities and the defendants' lobbying efforts. This portion of the court's ruling, however, will be stayed for ten days so that the defendants may pursue an immediate appeal. Finally, after reviewing the record, the court will not alter the initial allocation of the special master's fee which split his costs evenly between the plaintiffs and the defendants since the circumstances of this case warranted the appointment of a special master and the current allocation of his fee is equitable. The court will issue and order to this effect in conjunction with this opinion.